# Richmond

CHARLES WILFORD SMITH v. WILLIAM CURTIS PRATER.

January 17, 1966.

Record No. 6094.

Present, All the Justices.

*Francis W. Flannagan* (*Curtin, Haynes & Winston*, on brief). for the plaintiff in error.

*Stuart B. Campbell, Jr.* and *Robert I. Asbury* (*Campbell & Campbell*, on brief), for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This is an action for damages brought by William Curtis Prater against Charles Wilford Smith for personal injuries sustained by the plaintiff, who was a guest passenger in an automobile driven by Smith. There was a jury verdict for $17,500.00 in favor of Prater, on which the court entered judgment and Smith appealed. Smith contends: (1) that he was not guilty of gross negligence; (2) that his gross negligence, if any, was not a proximate cause of the accident; (3) that plaintiff was guilty of contributory negligence; and, (4) that plaintiff assumed the risk involved.

There are no assignments of error concerning the admissibility of evidence, or the granting, or refusal of instructions. The evidence viewed in the light most favorable to Prater, the prevailing party, may be summarized as follows:

The accident occurred about 1:00 a.m. on May 28, 1961, a short distance west of Shuler Bridge on East Main street, in the town of Marion, Virginia. East Main street is hard surfaced, 49 feet wide, with a speed limit, at that time, of 25 miles per hour. The surface of the road was dry and the weather clear.

At the time of the accident, Prater was 22 years of age, unmarried, and unemployed. Smith was also 22 years old, and employed as an operator of heavy equipment, "DW 21 Earth Mover," in Washington, D. C. He formerly lived in Marion; but, at the time of the trial, was a member of the U. S. Armed Forces. He was married, but lived apart from his wife, who spent some of her time in Marion with her parents.

On May 27, Prater and a young lady friend, Mary Louthian, after attending a drive-in movie in the evening, drove to a restaurant named Lee-High. They arrived at the restaurant between 11:30 p.m. and 12:00 M., and there parked their car.

Smith drove from Washington to Marion, on a visit, on the morning of May 27. Because of some mechanical difficulties with his own automobile, he borrowed his father's car, which he described as a 1952-six cylinder Ford, straight gear shift, "about shot. It had a lot of miles on it." He drove in this Ford to a restaurant where he drank some beer, purchased two six-packs of beer, took them to his car, drove to the home of his father-in-law, and there met his wife, Rita Armstrong Smith. Mrs. Smith got in the car with her husband, and they drove to the Lee-High, where they met Prater and Miss Louthian, all friends for some years.

After some conversation between the occupants of the two automobiles, Miss Louthian and Mrs. Smith decided to go, in the Smith car, and get Miss Louthian's younger sister, Jean. This they did, with Mrs. Smith driving. Smith and Prater got in Prater's automobile, to which Smith had brought three cans of beer. Prater produced a bottle of whiskey, which had a small drink in it. Smith and Prater then drove, in Prater's car, with Prater at the wheel, from Marion towards Sugar Grove. On this trip, the whiskey was consumed, as well as some of the beer, by Smith and Prater. After a short time, Smith and Prater returned to the Lee-High and rejoined Mrs. Smith, Miss Louthian and the latter's sister. Prater, Smith and the three women then got in the Smith car, and Mrs. Smith drove 16 miles to Atkins, the home of Jean Louthian. During the trip, the two men shared a can of beer.

When they left Atkins to return to Marion, Smith drove his car, the Ford. He and his wife occupied the front seat, and Prater and Miss Louthian the back seat. Upon reaching the home of Miss Louthian in Marion, Miss Louthian got out, and Prater then got in the front seat on the right-hand side, next to Mrs. Smith. They then traveled east on Cherry street, and came to Route 16, and thence to East Main street, where they made a stop, pursuant to a stop sign near an Esso Service Station. During all of this time, Smith was driving in a normal and careful manner. After they reached East Main street, Prater gave this version of what happened:

"And he stopped at the stop sign, put it in low gear and said something to his wife—and he put it in low gear and he took off and 'spinned' the wheels, put it up in second gear and 'spinned' another wheel, and he got along there about where the Texaco station is, I asked him to slow down and he looked over at me and laughed and kept going that much faster.

"When he went into the curve down there he went—the car got to scooting with him. I asked him to slow down again and he just kept going that much faster.

"Q. Let me interrupt you there. Did he make any response, you say the second time you asked him to slow down?

"A. No, sir, he didn't.

"Q. Didn't say anything or do anything?

"A. Just looked at me and laughed and kept going.

"Q. Sir.

"A. (Continuing) Then he went into the next curve. He crossed,

started across the road and it seemed to me like the door flew open. I don't know whether it was before we hit or what. And I got up out of the road, I remember getting out of the road, and some guy come along and picked me up."

Prater, when asked how he "went out" the right front door, replied: "I can't say for sure but, it seems to me like the door flew open and his wife come over against me. I don't know. I can't say for sure." Asked how the car was traveling when he was thrown out, he said: "Cross, pointed cross the road and scooting." He said that "scooting" meant "sliding and crossing the road all at the same time."

East of the Esso Station, there are two curves on East Main street, beginning .4 of a mile from the intersection with Sixteenth street. Looking to the east, the first curve turns to the driver's right and the next curve to the driver's left. Prater estimated that when the Ford entered the first curve and started "scooting," it was running 55 to 65 miles per hour or more.

Prater was seriously and permanently injured. Two of his fingers were required to be amputated, and he suffered grievous wounds to his fingers and portions of his head. He had splintered glass in his hair and face.

Asked to describe what occurred after they left Route 16, Mrs. Smith said:

"Well, he changed gears up to second and left it up there up to about thirty or thirty-five then changed gears and kept going faster. And Curt asked him to slow down and he just laughed at him and stepped down on the gas more. Curt asked him again to slow down but he didn't. He just kept going faster. We got to that curve up there at the Pepsi-Cola Plant and he started—the car started weaving. As we went around the curve the car started scooting and he lost control of it just before we got to the end of it. And we weaved back and forth and I don't remember—I *pust* my hands over my eyes, I don't remember what then. The next thing I remember, I was out on the road."

The car came to rest on its left-hand side of the road against a telephone pole. East Main street narrows slightly at Shuler Bridge, and there is an open space on the left side of the bridge for parking. The wrecked car was in this space immediately after the accident.

Smith, the defendant, denied that he was guilty of any negligence. He admitted that he had a small drink of whiskey and drank several bottles of beer. He denied that he had spun the wheels, or that the

car had the power to do so. He said that when he got in the first curve on East Main street, Prater asked him to "slow down. I want to take a drink;" that Prater had "a chaser and a whiskey in his hand;" that "When I made the curve back to my left they went out. I couldn't say what made them go out;" that his speed at that time was "Forty, forty-five;" that the "right-hand door flew open. It opened, I don't know whether it flew open or what, but there wasn't nothing wrong with my car door;" and "I let go of the steering wheel to catch my wife. I lost control of my car then;" and after he "let go of the steering wheel," the car "shot across on the left-hand side lane, hit a telephone pole;" and he got out, walked back to where his wife was, "20-30 feet behind the car." The "front center" of the car hit the pole, but no glass in the car was broken. It was towed or pushed away from the scene of the accident.

After the accident, Smith was taken by a friend to the home of his father-in-law, and there went to bed. He had a head wound, but did not seek medical attention. Later that night he was arrested and taken to jail. In the morning, it was discovered that his neck had been broken, he had three fractured vertebrae, and was taken to a hospital.

■ The burden was, as Smith contends, on Prater to prove by a preponderance of the evidence that the defendant operated his automobile in such a manner as to show an "utter disregard of prudence amounting to complete neglect of the safety" of his guest, and that such negligent operation proximately caused the accident complained of and the resulting injuries. *Dishman, Adm'r* v. *Pitts, Adm'r*, 202 Va. 548, 551, 118 S. E. 2d 509.

"Proof of gross negligence depends upon the facts and circumstances of each particular case." *Alspaugh* v. *Diggs*, 195 Va. 1, 5, 77 S. E. 2d 362; *Price* v. *Burton*, 155 Va. 229, 154 S. E. 499.

In *Carroll* v. *Miller*, 175 Va. 388, 399, 9 S. E. 2d 322, we said:

"In many instances we have to deal with borderline cases, and it is our duty to support verdicts when they, in turn, are supported by credible evidence, but not otherwise."

In *Smith, Ex'r* v. *Smith*, 199 Va. 55, 97 S. E. 2d 907, many of the recent decisions involving the question of gross negligence are cited and discussed. There we said:

"Since the dividing line between simple negligence for which the guest cannot recover and gross negligence for which he may is to be tightly drawn and carefully observed, it is important that the jury

which decides the question should be plainly instructed as to the difference." 199 Va., *supra*, page 61.

In addition to excessive speed, under certain circumstances, we have held that "One of the more common indicia of gross negligence is deliberate inattention to the operation of an automobile." *McDowell* v. *Dye*, 193 Va. 390, 398, 69 S. E. 2d 459; that failure to heed protests may be considered by a jury, along with other circumstances, in determining whether the driver's conduct amounts to gross negligence. *Worcester* v. *McClurkin*, 174 Va. 221, 226, 5 S. E. 2d 509; and that "If it is shown that the conduct of the defendant was deliberate, that fact constitutes important evidence on the question of gross negligence." *Kennedy* v. *McElroy*, 195 Va. 1078, 1082, 81 S. E. 2d 436.

The jury, in this case, was given, without exception, separate instructions, which substantially covered all of the issues here involved, and became the law of the case.

In *Garst* v. *Obenchain*, 196 Va. 664, 668, 85 S. E. 2d 207, we repeated what we have said in many cases: "Gross negligence, like all other kinds of negligence, is ordinarily a question of fact for the jury and only becomes a question of law for the court when, under the applicable rules of negligence, reasonable men should not differ as to the proper conclusion to be drawn from the evidence."

In *Washburn* v. *Dana*, 199 Va. 579, 584, 100 S. E. 2d 708, we said:

"The jury having rendered a verdict in favor of plaintiff, which was sustained by the trial court, all conflicts in the testimony and all reasonable inferences deductible therefrom must be resolved in plaintiff's favor. The judgment will not be reversed unless it is plainly wrong or without credible evidence to support it." (Citing cases.)

In *Huffman* v. *Sorenson*, 194 Va. 932, 937, 76 S. E. 2d 183, in undertaking to define proximate cause, this is said:

"Proximate cause is a concept difficult to define and almost impossible to explain conclusively. Each case necessarily must be decided upon its own facts and circumstances. *Price* v. *Burton*, 155 Va. 229, 154 S. E. 499. The proximate cause of an event is that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces that event, and without which that event would not have occurred." (Citing cases.)

The defendant here argues that the evidence was insufficient to show that his negligence or gross negligence, if any, was the proximate cause of the accident, since he says the cause was unexplained.

He places great reliance on the cases of *Sibley* v. *Slayton*, 193 Va. 470, 69 S. E. 2d 466; *Scott* v. *Foley*, 205 Va. 382, 136 S. E. 2d 849; and *Kent* v. *Miller*, 167 Va. 422, 189 S. E. 332.

In *Sibley* v. *Slayton, supra*, 193 Va., we held, as a matter of law, the defendant was not guilty of gross negligence, because the original causative factor of the accident [a defect in the highway] was not chargeable to the negligence of the defendant.

In *Scott* v. *Foley, supra*, 205 Va., page 387, we held that plaintiff's own testimony did not make out a case of gross negligence.

In *Kent* v. *Miller, supra*, 167 Va., page 427, we held that the plaintiff had utterly failed to establish the necessary fact that the defendant was guilty of gross negligence; and that her evidence was incredible. In that case, a new automobile was involved and other material factors distinguish it from the present case.

The following Virginia cases are more like the present case: *Stubbs* v. *Parker*, 169 Va. 676, 685, 192 S. E. 820; *Hackley* v. *Robey*, 170 Va. 55, 195 S. E. 689; and *Gill* v. *Haislip*, 201 Va. 840, 114 S. E. 2d 603.

In *Stubbs* v. *Parker, supra*, a jury verdict for the defendant was reversed on the ground that the evidence disclosed gross negligence of the automobile driver as a matter of law. The accident occurred in the city of Richmond. The defendant had travelled about one-half mile to the scene of the accident. Just after making a curve at high speed, the car went off the road to the right, striking a tree and demolishing the car. The guest passenger had protested the rate of speed, but the driver did nothing. Three Justices dissented; but the dissent was based on the ground that the evidence presented a jury question as to gross negligence.

In *Hackley* v. *Robey, supra*, a car proceeding on Broad street, 42½ feet wide, in Richmond, when the weather was clear and the road dry, failed to make a curve, went upon a curb and struck a lamp post. The driver was killed and the passenger remembered nothing. Under the circumstances of the case, we held that the jury had a right to think that Hackley, the driver, was operating the car at a very high rate of speed, and not maintaining any lookout for a situation that was obvious to him, and this constituted gross negligence.

In *Gill* v. *Haislip, supra*, the driver of the car was proceeding at a speed of 35 to 40 miles per hour on a street in Richmond, and increased his speed to 60 or 65 miles per hour. His passenger dis-

covered that the driver had been drinking excessively, and asked him to slow down or let him out. Thereupon, the driver accelerated his speed. As the car made a gradual curve into another street [Hatcher], the passenger saw the left door come open and the operator apparently falling out; whereupon, he reached for the operator, and fell out. He said: "That is all I remember." We held that, on the facts presented it was a jury question as to whether or not the defendant was guilty of gross negligence.

In *Connell* v. *C. & O. Ry. Co.*, 93 Va. 44, 57, 24 S. E. 467; *Fowlkes* v. *So. Ry. Co.*, 96 Va. 742, 747, 32 S. E. 464; *Allison* v. *City of Fredericksburg*, 112 Va. 243, 246, 71 S. E. 525; *Doss* v. *Big Stone Gap*, 145 Va. 520, 524, 134 S. E. 563; and *Spence* v. *American Oil Co.*, 171 Va. 62, 73, 197 S. E. 468, we adopted the following statement from *Milwaukee and St. P. Ry. Co.* v. *Kellogg*, 94 U. S. 469, 475, 24 L. ed. 256, 259:

"But it is generally held that, in order to warrant a finding that negligence, or an act not amounting to a wanton wrong, is the proximate cause of an injury, it must appear that the injury was a natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances." *Scheffer* v. *Railroad Company*, 105 U. S. 249, 250, 26 L. ed. 1070, 1071.

In *Scott* v. *Simms*, 188 Va. 808, 817, 818, 51 S. E. 2d 250, this rule is stated:

"In order for the defendant's negligence to be a proximate cause of the injury, it is not necessary that the defendant should have foreseen the precise injury that happened. It is sufficient if an ordinary, careful and prudent person ought, under the circumstances, to have foreseen that an injury might probably result from the negligent act. *Tripp* v. *Norfolk*, 129 Va. 566, 106 S. E. 360; *Price* v. *Burton*, 155 Va. 229, 154 S. E. 499; 25 Harvard Law Review, p. 238."

Here, we have a ten-year old worn out automobile, three persons on its front seat, being driven around double or reverse curves, at an unlawful and excessive speed, contrary to repeated protests of a passenger, weaving and sliding across the highway, regardless of other traffic, and out of control. There was deliberate inattention to its operation by the driver. He was driving in violation of the law, heedless of the protests of a passenger, displaying an utter lack

of prudence, and a complete disregard of the safety of his passengers, including his wife and himself.

To constitute his negligence as a proximate cause, it was "not necessary that the defendant should have foreseen the precise injury that happened." It was "sufficient if an ordinary, careful and prudent person ought, under the circumstances to have foreseen that an injury might probably result from his negligent" acts. *Scott* v. *Simms, supra,* 188 Va., pages 817, 818. Both Prater and Mrs. Smith foresaw the probable danger of injury, evidenced by the protests of Prater and the action of Mrs. Smith in putting her hands over her eyes.

It should be remembered that the road was dry, and there was no moisture thereon to cause skidding; that Mrs. Smith, seated in the middle of the front seat, was tossed about, or thrown around, or against Prater, by the movement of the automobile, at or about the time the door "flew open."

It is a matter of common knowledge that it is impossible to drive an automobile around a curve, at a high or suddenly accelerated rate of speed, without going off the traffic lane, or sliding, or causing passengers to shift or lurch in their seats, or be tossed about, or thrown against one another, or against the car doors; and courts take judicial notice thereof. *Fagg* v. *Carney,* 159 Va. 118, 123, 165 S. E. 419; *Kent* v. *Miller, supra,* 167 Va., page 427.

It will also be noted that the Ford car, while being driven from Marion to Atkins and returning, a distance of 32 miles, at normal speed, did not skid in the road, nor did its door fly open. The car made some right and left turns when it went to the home of Miss Louthian, and no trouble was had with its door coming open without design. It was not until the subsequent happening of the events related that its door "flew open."

It matters not whether Prater and Mrs. Smith were thrown out of the car when it was proceeding around the curves, skidding or weaving across the road, or when it struck the telephone pole, the negligent conduct of its driver was the original causation factor in either event.

We find no merit in the assignment that Prater was guilty of contributory negligence. There was no evidence that Smith was negligent in driving the Ford until he left the intersection of East Main street and Route 16. Nor was there anything to put Prater on notice that Smith would do anything out of the ordinary until he had driven from Route 16. When the improper driving occurred,

Prater protested not once but twice. He could hardly be expected to do more.

■ Nor was there any merit in the assignment that Prater assumed the risk involved, because he knew Smith had been drinking ardent spirits. There was no evidence that Smith was affected thereby, or his ability to drive the car impaired. Smith makes no claim to being under the influence of intoxicants. On the other hand, he said that he was in full possession of his faculties, knew what he was doing, and was driving with care. In the absence of notice to the contrary, Prater cannot be said to have intentionally exposed himself to danger.

The questions of contributory negligence and assumption of risk were jury questions, which have been resolved favorably to the plaintiff, as they ought to have been, and we cannot disturb the finding.

The law and the evidence support the verdict of the jury, and the judgment complained of is affirmed.

*Affirmed.*

GORDON, J., dissenting.

The plaintiff was unable to state why he fell out of the automobile; he refused even to speculate as to the reason. Yet the jury was permitted to determine that his falling out was caused by the defendant's gross negligence. Since the evidence affords no basis for that determination, it was necessarily based upon speculation.

Although there are many conflicts in the testimony, one proposition is uncontroverted: There was no evidence to support a finding that the plaintiff's injuries were caused by the automobile's striking the telephone pole. This was conceded at bar by plaintiff's counsel.

The plaintiff was obviously in a better position than the jury to determine why he fell out of the car. When asked why, he said: "I can't say for sure but, it seems to me like the door flew open and his wife come over against me. I don't know. I can't say for sure."

The majority resorts to judicial notice to fill the void in the plaintiff's evidence. It is not clear whether the majority takes judicial notice of the fact that the "scooting" could have caused the plaintiff to be thrown against the automobile door with sufficient force to cause it to open, or that the "scooting" alone could have caused the automobile door to open. But to conclude that the force of the defendant's body caused the door to open necessitates the supplying of evidence that the plaintiff himself refused to supply. The plaintiff

did not say that his body was even touching the door when it "flew open." And in the absence of any evidence showing why the door opened, only speculation can lead to the conclusion that the movements of the automobile caused it to open.

The cases relied upon by the majority—*Fagg* v. *Carney*, 159 Va. 118, 165 S. E. 419 (1932), and *Kent* v. *Miller*, 167 Va. 422, 189 S. E. 332 (1937)—do not support the judicial notice taken by the majority in this case.

It is difficult to perceive the relevance of *Fagg* v. *Carney*, which involved an injury to a boy on skates when he was struck by an automobile. We reversed the judgment for the plaintiff-boy because there was no proof of primary negligence. The observation of the Court—that, if the plaintiff's evidence were believed, the defendant's automobile "would have turned over or skidded in making such a turn"—cannot fairly be taken to support judicial notice of the cause of the opening of the door in this case.

Similarly, *Kent* v. *Miller* does not support the judicial notice taken in this case. There, the court noticed only that "It is impossible to drive an automobile around a 95 degree curve going at 45 or 50 miles an hour without turning over or going off the road or skidding or such untoward thing."

In fact, *Kent* v. *Miller*, which also involved a guest-passenger who fell out of an automobile, is authority for this dissent, not authority for the conclusion reached by the majority. This is demonstrated by excerpts from that opinion:

"The case of *Williams* v. *Lumpkin*, 169 Miss. 146, 152 So. 842, is enlightening here. Indeed the case presents a set of facts which are strikingly similar to those in the present case. We quote briefly from it as follows:

" 'The only evidence to sustain the contention that the rate of speed caused the door to come open was that, when the car suddenly swerved, the door came open. But any such swerve as shown in this record, even at the highest speed any witness testified to, would not cause a latched door of a modern automobile of the sedan type to come open. Such a swerve, however, would cause an unlatched door to come open.'

"So we think the plaintiff, Miss Miller, has utterly failed to establish the necessary fact that Kent was guilty of *gross* negligence.

"Concede that the door of the car came open as described by Miss Miller, still it is not an incident or event which could have been

foreseen by a reasonably prudent person as likely to happen if the door were latched. If it were not latched it was the omission or fault of Miss Miller, who got in the car on that side after Kent and Miss Wright had taken their seats. *Fowlkes* v. *Southern Ry. Co.*, 96 Va. 742, 32 S.E. 464."*

There are several possible reasons why the door opened and the plaintiff fell out. One possible reason is suggested in *Kent* v. *Miller*: The plaintiff in the present case may not have closed the door securely. Also, it is possible that the plaintiff, who admittedly had been drinking, inadvertently grasped the handle and unlatched the door.

There is no evidence to support the conclusion that the movements of the automobile could have caused the door to open. Contrary to the finding of the majority, I believe it is not within the realm of common knowledge that this could have occurred. According to the uncontradicted evidence, there was nothing wrong with the car door. In *Kent* v. *Miller* an expert, who had examined the automobile there involved, testified that it would have been impossible for the door to have come open unless the latch had been opened. In the absence of expert testimony, we cannot know whether it was possible for the door of defendant's automobile to have opened, unless the plaintiff failed to close it securely or unless he unlatched it just before he fell out.

Even if it be assumed that the movements of the automobile could have caused the door to open, the jury must have engaged in speculation in accepting this reason and rejecting other possible reasons—e.g. improper closing or inadvertent opening from the inside. The plaintiff failed to carry his burden of showing why his injuries occurred. To permit the jury to indulge in speculation is contrary to the settled law of this Commonwealth. *Barnes* v. *Barnes, Adm'r*, 199 Va. 903, 103 S.E. 2d 199 (1958).

For these reasons, I find the evidence insufficient to support a finding that the plaintiff's injuries were caused by the defendant's conduct. Therefore, I would reverse and enter final judgment for the defendant.

---

* 167 Va. 422, 426-427, 189 S.E. 332, 334-335.